ARIELLA OMHOLT GUARDI (IL Bar No. 6297336)
Email: guardia@sec.gov
JEDEDIAH B. FORKNER (IL Bar No. 6299787)
Email: forknerj@sec.gov
United States Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
United States Securities and Exchange Commission

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. |
| - against - | COMPLAINT |
| ROBERT M. VANCE, | JURY TRIAL DEMANDED |
| Defendant. | |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission"), for its Complaint against defendant Robert M. Vance, alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to Section 21 of the Exchange Act [15 U.S.C. §§ 78u].

2. The Commission brings this action pursuant to the authority conferred by Section 21(d) and (e) of the Exchange Act [15 U.S.C. § 78u(d) and 78u(e)].

3. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Acts, practices, and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Eastern District of California. Defendant resides in this district.

## PRELIMINARY STATEMENT

4. This matter concerns recommendations by Vance that certain retail customers purchase high risk, illiquid debt securities known as L Bonds. From approximately June 30, 2020 through approximately January 15, 2022 (the "Relevant Period"), these recommendations violated Rule 15*l*-1(a) under the Securities Exchange Act of 1934 ("Regulation Best Interest" or "Reg BI").

5. L Bonds were unrated corporate bonds offered by GWG Holdings, Inc. ("GWG"). According to GWG's disclosures during the Relevant Period, (a) L Bond investments involved a high degree of risk, including the risk of losing an investor's entire investment; (b) L Bond investments "may be considered speculative"; (c) L Bond investments were only suitable for investors with substantial financial resources and no need for liquidity in the investment; and (d) GWG would use a portion of the L Bond proceeds to repay existing L Bond holders. In addition, in November 2021, GWG disclosed, among other things, that several enumerated factors raised substantial doubt regarding its ability to continue as a going concern.

6. Despite these disclosures, in recommending the purchase of L Bonds to retail customers, Vance failed to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendations. Vance also recommended the purchase of L Bonds to at least four retail customers for whom he did not

have a reasonable basis to believe the recommendations were in the customers' best interest based on the customers' investment profiles and the potential risks, rewards, and costs associated with the L Bonds.

7. During the Relevant Period, at least 50 of Vance's retail customers purchased a total of approximately $4.3 million in L Bonds upon Vance's recommendations. Many of these customers were at or near retirement age and had moderate risk tolerance.

8. There is a reasonable likelihood that Vance will, unless enjoined, continue to engage in transactions, acts, practices and courses of business of similar purport and object to those set forth in this complaint.

9. The SEC therefore seeks a judgment against Vance providing permanent injunctive relief; disgorgement of ill-gotten gains, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), (7)]; imposing civil monetary penalties, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; as well as other appropriate and necessary relief.

## DEFENDANT

10. **Robert M. Vance**, age 73, is a resident of Mi-Wuk Village, California. He worked as a registered representative for Moloney Securities Co., Inc. from 2016 until approximately November 2023. During the Relevant Period, Vance was registered as General Securities Representative (i.e., Series 7), General Securities Principal (i.e., Series 24), and Uniform Combined Securities Agent (i.e., Series 66). He is not currently associated with a registered broker-dealer.

# RELATED ENTITIES

11. **Moloney Securities Co., Inc.** ("Moloney") is a Missouri corporation headquartered in Manchester, Missouri and has been registered with the Commission as a broker-dealer pursuant to Section 15(b) of the Exchange Act since 1995.

12. **GWG Holdings, Inc.** ("GWG") was a publicly traded financial services company (NASDAQ:GWGH) with its principal executive offices in Dallas, Texas.

# FACTUAL ALLEGATIONS

## I. BACKGROUND

### A. Requirements of and Commission Guidance Regarding Reg BI

13. Reg BI, which became effective on June 30, 2020, established a standard of conduct for broker-dealers and associated persons when they recommend securities transactions to retail customers.

14. In July of 2019, the SEC issued an adopting release, offering guidance on how the Commission interprets Reg BI. *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, Exchange Act Release No. 34-86031, 84 Fed. Reg. 33318 (July 12, 2019) (the "Adopting Release").

15. Reg BI's General Obligation requires a broker, dealer, or a natural person associated with a broker or dealer, when making a recommendation of any securities transaction to a retail customer, to act in the best interest of that retail customer at the time the recommendation is made, without placing the financial or other interest of the broker, dealer, or associated person ahead of the interest of the retail customer. The Adopting Release states that the standard of conduct established by Reg BI cannot be satisfied through disclosure alone.

16. Reg BI's General Obligation is made up of four Component Obligations: (1) Disclosure Obligation, (2) Care Obligation, (3) Conflict of Interest Obligation, and (4) Compliance Obligation. Failure to comply with any of the Reg BI's four Component Obligations violates the General Obligation.

17. Reg BI's Care Obligation requires, among other things, that in making a recommendation of any securities transaction or investment strategy involving securities to a retail customer, brokers, dealers, and associated persons of broker-dealers exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation. This is called the "Reasonable Basis" prong of Reg BI's Care Obligation.

18. The Care Obligation also requires that, in making a recommendation of any securities transaction or investment strategy involving securities to a retail customer, brokers, dealers, and associated persons of broker-dealers exercise reasonable diligence, care, and skill to have a reasonable basis to believe the recommendation is in the best interest of a particular retail customer, based on the customer's investment profile and the potential risks, rewards, and costs associated with the recommendation. This is called the "Customer Specific" prong of Reg BI's Care Obligation.

19. The Adopting Release states that what is in the best interest of a retail customer depends on the facts and circumstances of the recommendation, including "matching" the recommended security to the retail customer's investment profile. Where the "match" between the retail customer profile and the recommendation appears less reasonable, it is more important for the broker to establish that it had a reasonable belief that the recommendation was in the best interest of the retail customer.

20.     The Adopting Release also states that a registered representative should exercise reasonable diligence, care, and skill to consider reasonably available alternatives.

**B.     GWG and L Bonds**

21.     GWG was a publicly traded financial services company. Prior to 2018, GWG's business model involved acquiring life insurance policies in the secondary market.

22.     Following several transactions with Beneficient Company Group L.P. ("Beneficient") in 2018 and 2019, GWG reoriented its business. Instead of acquiring life insurance policies, it began to focus on Beneficient's business model of providing liquidity to holders of illiquid investments and alternative assets. In addition, GWG's CEO and Board of Directors resigned and were replaced.

23.     GWG had a history of net losses and had not generated sufficient operating and investing cash flows to fund its operations. Neither GWG nor Beneficient was profitable during 2018 or 2019, and both companies posted net losses from operations exceeding $79 million during both years.

24.     GWG depended on financing – primarily debt financing, such as through the sale of L Bonds – to fund its operations. Since 2012, GWG had raised funds for its operations by selling L Bonds to retail customers through a nationwide network of broker-dealers.

25.     In June 2020, GWG began a new L Bond offering under which it planned to issue up to $2 billion of = L Bonds. L Bonds sold in this offering were unrated; had terms of two, three, five, and seven years; and paid fixed interest rates of between 5.50% and 8.50%, depending on the term.

26.     The offering document GWG used for this bond offering (the "June 2020

Prospectus") disclosed that, among other things,

    (a)    L Bonds involved a "high degree of risk," including the risk of losing one's entire investment;

    (b)    L Bonds "may be considered speculative";

    (c)    GWG would use a portion of L Bond proceeds to repay existing L Bond holders; and

    (d)    "L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment."

27. GWG temporarily ceased the sale of L Bonds in April of 2021 because it was unable to file its Form 10-K for the year ended December 31, 2020 ("2020 Form 10-K").

28. GWG subsequently filed its 2020 Form 10-K on November 5, 2021 and resumed selling L Bonds shortly after issuing a supplement to the June 2020 Prospectus ("November 2021 Prospectus Supplement").

29. GWG's 2020 Form 10-K reported a net loss of $215 million and interest expenses that exceeded total revenue by $30 million. 66% of GWG's total assets consisted of goodwill.

30. GWG's November 2021 Prospectus Supplement and 2020 Form 10-K contained additional important information and disclosures about GWG and L Bonds, including:

    (a)    there was "substantial doubt" about GWG's ability to continue as a going concern for the next twelve months following the filing of the 2020 Form 10-K;

    (b)    there was a material weakness in GWG's internal control over financial

reporting for all periods from December 31, 2019 to December 31, 2020;

(c) GWG heavily relied on the sales of L Bonds to fund its operations and GWG's viability as a business would be negatively impacted if demand for the L Bonds dissipated;

(d) GWG's ability to service and repay debt obligations would be compromised if it was forced to again suspend L Bond sales or if the demand for L Bonds dissipated;

(e) there was a possibility GWG would lose its ability to exercise control over Beneficient; and

(f) there could be impairments to goodwill, which constituted the majority of GWG's consolidated assets, and such impairments would require GWG to write down the value of that goodwill.

31. On January 15, 2022, GWG filed a Form 8-K disclosing that it had failed to make L Bonds interest payments of approximately $10.35 million and L Bonds principal payments of approximately $3.25 million.

32. On April 20, 2022, GWG filed a bankruptcy petition in the Southern District of Texas Bankruptcy Court. Since then, GWG has failed to pay millions of dollars in interest payments to L Bond investors.

C. **Moloney's Processes for Selling L Bonds**

33. Through its registered representatives, Moloney sold various securities to retail customers, including alternative investments, like L Bonds; preferred stocks; stocks; bonds; mutual funds; and options.

34. For their customers' L Bond investments, Moloney registered representatives

were required to complete two forms:

    (a)    A one-page purchase form provided by GWG, which contained information about the customer and the type and amount of L Bond they sought to purchase.

    (b)    An Alternative / Illiquid Investment Suitability Form ("Moloney Suitability Form"), which contained customer information – including age, net worth excluding home ("Net Worth"), liquid net worth, annual income, investment knowledge, investment objective, and risk tolerance.

35. The Moloney Suitability Forms included five possible investment objectives: "Preservation of Principal/Income," "Balanced Growth," "Growth," "Aggressive Growth/ Aggressive Income," or "Speculation."

36. The Moloney Suitability Form also included five possible risk tolerance levels: 1) "I am willing to accept minimal risk, even if that means my investment does not generate significant income or returns and may not keep pace with inflation"; 2) "I am willing to accept low risk, including low volatility, and understand that I could lose a modest amount of my investment"; 3) "I am willing to accept moderate risk, including some volatility, to seek higher returns and understand I could lose a portion of my investment"; 4) "I am willing to accept high risk, including high volatility, and understand I could lose a substantial amount of my investment"; and 5) "I am willing to accept maximum risk and understand I could lose all of my investment."

37. The Moloney Suitability Form included a section that required the registered representative, for all purchases by retail customers subject to Reg BI, to "describe how this purchase is in the client's best interest" (the "Best Interest Rationale").

38. Moloney's written policies and procedures advised registered representatives to "document suitability" of any recommended alternative or complex products, such as L Bonds.

39. Moloney's written policies and procedures also included special instructions for its registered representatives regarding "high yield debt securities," such as L Bonds. The written policies and procedures required registered representatives to consider specific risk factors before recommending any high yield debt securities to their customers. They also mandated that all customers who purchased high yield debt securities must have "higher risk" as one of their investment objectives.

## II. VANCE RECOMMENDS L BONDS TO RETAIL CUSTOMERS IN VIOLATION OF REG BI'S CARE OBLIGATION.

40. During the Relevant Period, Vance was a registered representative with Moloney. Most of his customers were retirees or were approaching retirement.

41. By the time the June 2020 L Bond offering began, Vance had been recommending GWG securities for over ten years. Over the years, Vance had developed relationships with several GWG personnel, including the ex-CEO who resigned in 2019.

42. From July 2020 to April 2021, despite the risks disclosed by GWG discussed above in Paragraphs 23 through 26, Vance recommended approximately $3 million of L Bonds to at least 40 customers.

43. From December 2021 to January 2022, *after* GWG disclosed the additional risks, as discussed above in paragraphs 29 through 30, Vance recommended another approximately $1.2 million of L Bonds to at least 13 customers.

### A. Vance's Failure to Comply with the Reasonable Basis Prong of Reg BI's Care Obligation

44. Vance was aware of the above-described risks associated with L Bonds. Vance reviewed the June 2020 Prospectus and the November 2021 Prospectus Supplement.

45. However, Vance unreasonably disregarded, dismissed, misunderstood, or failed to take reasonable steps to understand significant disclosures and information regarding the potential risks, rewards, and costs associated with the L Bonds described in the June 2020 Prospectus, the 2020 Form 10-K, and the November 2021 Prospectus Supplement. For example, Vance unreasonably dismissed the language in the June 2020 Prospectus stating that the L Bond investments "may be considered speculative" and involved a "high degree of risk" as typical or commonplace language in a prospectus, despite the unique risks presented by L Bonds.

46. As another example, Vance gave unreasonable weight to GWG's payment history and his relationships with past GWG personnel, given the interceding changes in GWG's leadership and business model.

47. Vance also unreasonably dismissed the disclosures in the June 2020 Prospectus, the November 2021 Prospectus Supplement, and the 2020 Form 10-K that GWG relied on proceeds from sales and renewals of L Bonds to fund its operations and to repay existing debt obligations, including the interest and principal on existing L Bonds, even after GWG stopped selling L Bonds between April and November 2021 and the information incorporated into the 2020 Form 10-K that showed no positive operating revenue to replace the L Bond revenue.

48. In addition, Vance unreasonably dismissed the going concern and material

weakness disclosures in the November 2021 Prospectus Supplement and failed to reasonably assess these risks in determining whether to recommend L Bonds to retail customers in December 2021 and January 2022.

    **B.**    **Vance's Failure to Comply with the Customer Specific Prong of Reg BI's Care Obligation**

49. Vance did not have a reasonable basis to believe that the L Bond investments he recommended were in the best interest of at least four specific retail customers, as described below.

| Cust-omer | Age | Investment Objective | Risk Tolerance | Date of Sale | Current L Bond Purchase | Total L Bond Holdings | Annual Income | Appx. Net Worth | L Bond % of Net Worth |
|---|---|---|---|---|---|---|---|---|---|
| A | 61 | Growth | Moderate | 9/1/20 | $40,000 | $150,000 | <$70k | $450k | 33% |
| B | 75 | Growth | Moderate | 10/1/20 | $49,000 | $49,000 | <$70k | $170k | 29% |
| C | 60 | Growth | Moderate | 12/13/21 | $120,000 | $120,000 | $110k | $1.2m | 10% |
| D | 61 | Growth | Moderate | 12/13/21 | $25,000 | $77,326 | $117k | $800k | 10% |

50. These four customers' risk tolerances, investment objectives, and net worth were a mismatch for the L Bond investments Vance recommended. According to Moloney's Suitability Forms, each of the customers had a growth objective and moderate risk tolerance. According to the Moloney Suitability Form, this meant these customers were "willing to accept moderate risk, including some volatility, to seek higher returns" and understood they "could lose a portion of [their] investment." Further, each customer was at or near retirement age, and invested 10% or more of their net worth in L Bonds based on a recommendation from Vance.

    *1. Customer A*

51. In or around August of 2020, Vance recommended L Bonds to Customer A. According to the Moloney paperwork, Customer A was 61 years old, had an annual income under $70,000, and had a liquid net worth under $70,000. At the time of this

recommendation, Customer A already held $110,000 worth of 5-year L Bonds that were set to mature between 2022 and 2025.

52. Upon Vance's recommendation, Customer A purchased $40,000 in 5-year L Bonds on or around September 1, 2020. This purchase brought Customer A's total L Bond holdings to $150,000, which constituted 33% of Customer A's Net Worth.

53. The Best Interest Rationale that Vance included in Customer A's Moloney Suitability Form stated, "Client is looking for stable income and diversification outside the stock market."

54. Vance did not consider any alternatives to L Bonds for Customer A's September 2020 investment.

### 2. Customer B

55. Vance recommended L Bonds to Customer B in or around September or October of 2020. According to the Moloney paperwork, Customer B was a 75-year-old retiree with an annual income under $70,000 and less than $70,000 in liquid net worth.

56. Upon Vance's recommendation, Customer B purchased $49,000 in 5-year L Bonds on or around October 1, 2020.

57. Customer B's L Bond holdings constituted 29% of Customer B's Net Worth.

58. In the Best Interest Rationale section of Customer B's Moloney Suitability Form, Vance wrote, "Client is looking for stable income outside of the stock market."

59. Vance did not consider any alternatives to L Bonds for Customer B's October 1, 2020 investment.

### 3. Customer C

60. Vance recommended L Bonds to Customer C in or around December 2021. According to Customer C's Moloney paperwork, Customer C was 60 years old and had an annual income of $110,000. Customer C's Customer Suitability Form stated that Customer C's objective with this investment was to "protect the principal and make a modest return on investment that is not tied to the stock market."

61. Upon Vance's recommendation, Customer C purchased $120,000 in 3- and 5-year L Bonds on or around December 13, 2021.

62. This L Bond investment constituted 10% of Customer C's Net Worth.

63. In the Best Interest Rationale section of Customer C's Moloney Suitability Form, Vance wrote, "Wants diversity outside of the stock market. Likes the idea of a set interest rate and not having daily fluctuations in account."

### 4. Customer D

64. Vance recommended L Bonds to Customer D in or around December of 2021. According to Customer D's Moloney paperwork, Customer D was a 61-year-old retiree with an annual income of $117,000. Customer D's Customer Suitability Form stated that Customer D's objective with this investment was "[w]anting longer term investment not tied to stock market."

65. Upon Vance's recommendation, Customer D purchased $25,000 in 7-year L Bonds on or around December 13, 2021. This brought Customer D's total L Bond holdings to over $77,000, which constituted 10% of Customer D's Net Worth.

66. In the Best Interest Rationale section of Customer D's Moloney Suitability Form, Vance wrote, "Client is looking for longer term investment that pays good dividends and is not tied to the stock market."

67. Vance did not consider any alternatives to L Bonds for Customer D's December 2021 investment.

C. **Vance's Commissions from the L Bond Recommendations He Made in Violation of Reg BI**

68. GWG paid commissions of 3.25% to 5% of the value of each L Bond sold, depending on the term of the L Bond. For those L Bonds he recommended, Vance obtained approximately 80-90% of those commissions, through an LLC he controlled.

69. Vance received approximately $200,000 in commissions for his retail customers' L Bond purchases during the Relevant Period.

**CLAIM FOR RELIEF**
**Violations of Reg BI's General Obligation**

**[Exchange Act Rule 15*l*-1(a)(1), 17 CFR § 240.15l-1(a)(1)].**

70. The SEC realleges and incorporates by reference paragraphs 1 through 69 above.

71. By engaging in the conduct described above, when making recommendations of securities transaction to retail customers, Vance failed to act in the best interest of the retail customers by failing to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation.

72. Also, by engaging in the conduct described above, Vance made recommendations to retail customers without exercising reasonable diligence, care, and skill

to have a reasonable basis to believe the recommendations were in the best interests of the particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.

73. Vance's failures to comply with Regulation Best Interest's Care Obligation constitute violations of Regulation Best Interest's General Obligation.

74. By reason of the foregoing, Vance violated, and, unless restrained and enjoined will continue to violate, Exchange Act Rule 15*l*-1(a)(1) [17 CFR § 240.15l-1(a)(1)].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Vance committed the violations alleged herein.

**II.**

Issue judgment, in form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining Vance and all persons in active concert or participation with him, from violating the federal securities laws alleged in this complaint.

**III.**

Order Vance to pay disgorgement of any unjust enrichment he received as a result of the misconduct alleged, together with prejudgment interest thereon, under Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7)].

**IV.**

Order Vance to pay civil penalties under Section 21(d)(3) of the Exchange Act [ 15

U.S.C. § 78u(d)(3)].

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

## **JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.

Dated: September 27, 2024

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

/s/   *Ariella O. Guardi*
Ariella O. Guardi